UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UP STATE TOWER CO., LLC and
BUFFALO-LAKE ERIE WIRELESS
SYSTEMS CO., LLC,

                Plaintiffs,

      v.

THE TOWN OF TONAWANDA, NEW YORK,
THE TOWN BOARD OF TONAWANDA, NEW
YORK, THE ZONING BOARD OF APPEALS
OF THE TOWN OF TONAWANDA, NEW
YORK, and THE PLANNING BOARD OF
THE TOWN OF TONAWANDA, NEW YORK,

                Defendants.

1:18-CV-00952 LJV(MJR)

REPORT AND
RECOMMENDATION

## INTRODUCTION

This case has been referred to the undersigned by the Honorable Lawrence J. Vilardo, pursuant to Section 636(b)(1) of Title 28 of the United States Code, for all pretrial matters and for hearing and reporting on dispositive motions for consideration by the District Court. (Dkt. No. 8) Before the Court is Up State Tower Company, LLC's ("Up State Tower") and Buffalo-Lake Erie Wireless Systems Company, LLC's (doing business as "Blue Wireless") (collectively "plaintiffs") motion for summary judgment and injunctive relief pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 29) For the following reasons, it is recommended that plaintiffs' motion for summary judgment and request for an injunction be granted.

## PROCEDURAL BACKGROUND

On August 29, 2018, plaintiffs commenced the instant action against the Town of Tonawanda (the "Town"), the Town Board of Tonawanda, New York (the "Town Board"), the Zoning Board of Appeals of the Town of Tonawanda, New York (the "Zoning Board"), and the Planning Board of the Town of Tonawanda, New York (the "Planning Board") (collectively "defendants").  (Dkt. No. 1)  Plaintiffs allege that defendants violated the Telecommunications Act of 1996 as well as Articles 78 and 30 of the New York Civil Practice Laws and Rules by denying plaintiffs' request for special use permits for the erection of public utility wireless telecommunications towers at two separate locations in Tonawanda, New York. (Dkt. No. 1) Plaintiffs seek both a declaratory judgment annulling defendants' denials of the special use permits as well as an injunction requiring defendants to issue all permits and approvals necessary for plaintiffs to erect the two proposed wireless communications towers. (*Id.*)

The Court held a preliminary pretrial conference in this matter on November 26, 2018.  (Dkt. No. 10)  At that time, the parties agreed that defendants would provide plaintiffs the complete administrative record by February 11, 2019, and that summary judgment motions were to be filed on or before March 11, 2019.[1]  (*Id.*)  The deadline for the filing of dispositive motions was repeatedly adjourned, at the request of the parties, on the basis that the parties were engaged in settlement negotiations and were attempting to resolve the case.   On July 8, 2020, plaintiffs filed the instant motion for summary judgment.  (Dkt. No. 29)  During a status conference on July 15, 2020, plaintiffs' counsel

---

[1] The parties agreed that fact discovery would not be needed.  Instead, defendants would produce to plaintiffs the record of the prior administrative proceedings as to the special use permit applications, and dispositive motions would follow based on the information contained therein.

advised the Court that settlement discussions had been unsuccessful.    Plaintiffs requested the completion of briefing and the adjudication of their summary judgment motion.  Defendants filed a response to plaintiffs' motion on August 10, 2020 (Dkt. Nos. 31-32) and plaintiffs filed a reply on August 24, 2020 (Dkt. No. 35).  The Court heard oral argument on September 2, 2020.

## FACTS[2]

### *Plaintiffs' Identification of a Coverage Gap in Wireless Service*

Up State Tower and Blue Wireless are limited liability corporations with principal places of business in Bethesda, Maryland.  (Dkt. No. 1, ¶¶16-17)  Blue Wireless is licensed by the Federal Communications Commission ("FCC") to provide commercial and personal mobile telephone services in the Town of Tonawanda, New York, and is considered a public utility for zoning purposes.[3]  (*Id.* at ¶17, ¶35)  Blue Wireless provides its wireless services through a network of wireless telecommunications facilities that consistent of towers or other tall structures.  (*Id.* at ¶42)  To that end, each facility within

---

[2] The facts described herein are taken from the pleadings, motion papers, and exhibits filed in this lawsuit, as well as from plaintiffs' Statement of Undisputed Material Facts.  (Dkt. No. 29-16)  Local Rule of Civil Procedure 56 for the Western District of New York requires a party opposing a motion for summary judgment to include a response to each numbered paragraph in the moving party's statement of undisputed facts and, if necessary, additional paragraphs containing a statement of additional material facts to which the party contends there exist a genuine issue to be tried.  *See* Local Rule Civ. P. 56(a)(2). In contravention of this Local Rule, defendants did not file a proper response to plaintiffs' statement of undisputed facts.  Instead, defendants filed an "Opposition to Plaintiff's Motion for Summary Judgment" which contains no citation to the record or to any exhibits, nor does it correspond to the numbered paragraphs in plaintiffs' Statement of Undisputed Facts.  (Dkt. No. 31)  For this reason, the Court deems admitted all of the facts contained in plaintiffs' Statement of Undisputed Facts.  *See* Local Rule Civ. P 56(a)(2) (statements of material fact by a moving party that are not specifically controverted by a correspondingly numbered paragraph in an opposing statement may be deemed admitted); *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244, 246 (2d Cir. 2004) ("[T]he failure to respond may allow the district court to accept the movant's factual assertions as true."); *Marino v. Schult*, 764 Fed. Appx. 73, 74 (2d Cir. 2019) ("If a non-moving party fails to comply with local rules governing summary judgment, a district court may rely on a moving party's statement of undisputed facts as long as those facts are supported by the record.")  Thus, in making a recommendation on the instant motion, the Court has considered all of the facts set forth in plaintiffs' Statement of Undisputed Facts which are supported by the record, as well as any other evidence in the record which the Court has deemed relevant.

[3] *See Cellular Telephone Co. v. Rosenberg*, 82 N.Y.2d 364 (1993).

a wireless network is capable of providing reliable coverage to only a limited geographic area, and that coverage is directly impacted by topography, trees, existing structures or buildings, the frequency of the wireless signal, and other factors. (*Id.* at ¶43) The design and placement of the facilities or "cell sites" within a network is location-sensitive, and each cell site's coverage area must connect with neighboring cell sites. (*Id.* at ¶44) Further, the cell sites cannot be located too far away from other sites as to create a gap in coverage, and cannot be located too close together as to overlap and cause interference. (*Id.* at ¶¶44-45)

Plaintiffs submit that Blue Wireless identified coverage gaps in wireless service in areas in and around Tonawanda, New York. (Dkt. No. 1, ¶46) To address these gaps, Blue Wireless' engineering team developed search rings in order to determine where best to place additional facilities. (*Id.* at ¶47) When a coverage gap exists, Blue Wireless prefers to identify an existing tower or tall structure of sufficient height that is capable of permitting Blue Wireless to place or "collocate" its equipment on the existing structure. (*Id.* at ¶51) In keeping with this policy, Blue Wireless first identified existing facilities or towers in areas of Tonawanda, New York, that could potentially be used to address Blue Wireless' coverage needs. (*Id.* at ¶53) Upon further study, the existing towers were determined to be incapable of addressing Blue Wireless' service needs due to structural and height deficiencies. (*Id.*)

On August 3, 2016, plaintiffs applied to the Town for a special use permit to remove an existing telecommunications tower located at 860 Niagara Falls Boulevard, Tonawanda, New York and to construct, in its place, a new telecommunications tower (the "2016 Application"). (Dkt. No. 29-16, ¶1; Dkt. No. 29-3) On February 16, 2017,

plaintiffs submitted a separate application to the Town for a special use permit to remove an existing telecommunications tower located at 203 Kenmore Avenue, Tonawanda, New York and to construct, in its place, a new telecommunications tower (the "2017 Application").  (Dkt. No. 29-16, ¶12; Dkt. No. 29-8)  In the Applications, plaintiffs represented that Upstate Tower would construct and own both towers, and that Blue Wireless would collocate their antennas and related equipment on the towers in order to address coverage gaps in the Tonawanda area.  (Dkt. Nos. 29-3 and 29-8)

The 2016 Application

Plaintiffs' 2016 Application included, inter alia: (1) application forms; (2) a description of the project; (3) an explanation of compliance with the Telecommunications Act of 1996; (4) environmental assessment forms; (5) a Site Selection and Justification Report consisting of radio frequency memorandum, search rings and propagation maps; (6) FCC licenses and a FCC compliance report; (7) a structural analysis report of the existing towers on the property; (8) a lease agreement; and (9) project plans.  (Dkt. No. 29-3)  In the Site Selection and Justification Report, plaintiffs explained how Blue Wireless' radio frequency ("RF") engineering team uses propagation and coverage prediction software to analyze existing coverage areas and gaps in coverage.[4]  (Dkt. No. 29-3)  Based on these studies, the RF engineering team identified a gap in coverage at the intersection of Sheridan Drive and Bailey Avenue in the Town of Tonawanda.  (Dkt. No. 29-16, ¶3; Dkt. No. 29-3)  The Site Selection and Justification Report contained an Existing Coverage Map depicting the gap in coverage identified by the RF engineering

_____

[4] Plaintiffs explained that a "propagation study" determines where a cell site should be placed in order to provide adequate coverage throughout a cell and appropriate overlapping coverage with neighboring cells. (Dkt. No. 29-3)  The study considers cell boundaries, topography and other factors. (Id.)

team. (*Id.*) A search ring map, also included in the Site Selection and Justification Report, depicted a "candidate location search area" that would, once a cell site is installed, assist in providing primary coverage to the surrounding area. (*Id.*) The Site Selection and Justification Report further explained that the surrounding neighborhoods and commercial corridors would gain adequate in-building coverage by placing a facility or cell site in the candidate location search area shown on the map. (*Id.*) A Proposed Coverage Map was included to depict the predicted coverage. (*Id.*)

The Site Selection and Justification Report explained that, after the RF engineering team identified the coverage gap and conducted the candidate location search, plaintiffs selected 860 Niagara Falls Boulevard as a proposed site for placement of a facility to remedy the gap. (Dkt. No. 29-3) The site was chosen primarily because two telecommunications towers already exist on the premises. (Dkt. No. 29-16, ¶4; Dkt. No. 29-3) The Site Selection and Justification Report indicated that the taller of the two existing towers at 860 Niagara Falls Boulevard is a 155' self-support tower owned by American Tower Corporation. (Dkt. No. 29-3) After additional study, plaintiffs determined that this tower is already occupied by multiple carriers, and has no further capacity for collocation. (Dkt. No. 29-16, ¶5; Dkt. No. 29-3) Plaintiffs further determined that the existing 155' tower would require significant and costly structural upgrades in order to collocate Blue Wireless' equipment, and that even if the tower was upgraded, the available height on the tower would remain insufficient to satisfy plaintiffs' coverage objectives. (*Id.*) The Site Selection and Justification Report proceeded to explain that the shorter existing tower located at 860 Niagara Falls Boulevard, which has an approximate height of 78.4', was also determined to be insufficient to address the

coverage gap.  (Dkt. No. 29-3)  Specifically, the 78.4' tower is used by the landowner for two-way radio communication; was not designed to support the array of wireless antennas needed to address the coverage gap; and is of insufficient height.  (Dkt. No. 29-16, ¶6; Dkt. No. 29-3)

The Site Selection and Justification Report further explained that plaintiffs evaluated the search ring and immediately surrounding area and did not identify any other suitable towers or tall structures on which collocation of Blue Wireless' equipment would be possible.  (Dkt. No. 29-3)  For these reasons, the 2016 Application ultimately proposed replacing the shorter, existing 78.4' telecommunications tower at 860 Niagara Falls Boulevard with a new tower, specifically a 140' monopole telecommunications facility, in order to remedy the coverage gap.  (Dkt. No. 29-16, ¶7; Dkt. No. 29-3)  The new tower would be designed to accommodate additional carriers, including antennas to be relocated from the tower to be replaced.  (Dkt. No. 29-3)

On August 22, 2016, the Town rejected plaintiffs' 2016 Application for insufficient information.  (Dkt. No. 29-16, ¶8; Dkt. No. 29-4)  The Town requested, *inter alia*, (1) a detailed inventory of other existing facilities or cell sites within the Town of Tonawanda and one mile of its borders; (2) the proposed colors of the new tower, antennas and equipment; (3) the dimensions of the equipment to be installed on the new tower; and (4) information as to the tower and equipment's setbacks from the property line.  (*Id.*)  Plaintiffs provided the Town with the requested supplemental information on October 28, 2016.  (Dkt. No. 29-16, ¶9; Dkt. No. 29-5)  Therein, plaintiffs identified three existing sites operated by Blue Wireless within Tonawanda.  (*Id.*)  The sites included: (1) a rooftop facility located at 1868 Niagara Falls Boulevard; (2) a rooftop facility located at 205

7

Yorkshire Road; an (3) an existing facility located at 2265 Sheridan Drive. (*Id.*) However, plaintiffs further represented that, based upon the search ring and other information obtained during the RF engineering study, none of the existing towers or tall structures in or near the area were available or suitable for collocation. (*Id.*) Plaintiffs also explained that "alternative technologies [were] not feasible or practical, especially considering the presence of towers on the property currently." (*Id.*) Plaintiffs noted that "aside from the proposed height increase, the proposed replacement tower [would] largely maintain current site conditions." (*Id.*) Plaintiffs indicated that the tower, antennas, and equipment are typically gray. (*Id.*) However, they could be painted another color depending upon the Town's preference. (*Id.*) Plaintiffs also provided project plans depicting the proposed tower and antennas anticipated setbacks from the facility to the adjacent property lines, and noted that mature trees along the property line would be unaffected and would provide a natural buffer to the western portion of the facility. (*Id.*)

On November 25, 2016, the Town wrote to plaintiffs conceding that "most of the items in [the] initial letter [requesting supplemental information] [had] been addressed." (Dkt. No. 29-16, ¶10; Dkt. No. 29-6) However, the Town sought further information as to the location of the antenna arrays with respect to the property line. (*Id.*) On January 20, 2017, plaintiffs supplied the Town with updated and revised plans demonstrating the setbacks from the property line as to both the proposed tower's monopole and the antenna arrays. (Dkt. No. 29-16, ¶11; Dkt. No. 29-7)

*The 2017 Application*

On February 16, 2017, plaintiffs sought a special use permit to replace an existing telecommunications tower at 203 Kenmore Avenue, Tonawanda, New York with a new

public utility telecommunications tower at the same location.  (Dkt. No.  29-16, ¶12; Dkt. No. 29-8)  Specifically, plaintiffs proposed replacing the existing 75' tower with a 100' monopole telecommunications tower.  (*Id.*)  Similar to the 2016 Application, the 2017 Application included, *inter alia*: (1) applications forms; (2) a description of the project; (3) structural analysis of the existing tower; (4) a Site Selection and Justification Report consisting of a radio frequency memorandum, search rings and propagation maps; (5) FCC licenses and FCC compliance reports; (6) environmental assessment forms; (7) a lease agreement; and (8) project plans.  (Dkt. No. 29-16, ¶13; Dkt. No. 29-8)

The Site Selection and Justification Report submitted with the 2017 Application documented that Blue Wireless' RF engineering team found an in-building coverage gap in the vicinity of Kenmore Avenue and Niagara Falls Boulevard in the Town of Tonawanda.  (Dkt. No. 29-16, ¶14; Dkt. No. 29-8)  A Coverage Map was included to demonstrate the gap.  (Dkt. No. 29-8)  Just as they did with respect to the 2016 Application, Blue Wireless' RF engineering team used a search ring to develop a candidate location search area.  (*Id.*)  A map of the search ring and candidate search location area was also included in the Application.  (*Id.*)  This map demonstrated the area within which a new facility or cell site should be installed to provide primary coverage for the surrounding area.  (*Id.*)  Like the 2016 Application, a Proposed Coverage Map was submitted to depict the predicted coverage.  (*Id.*)

The Site Selection and Justification Report further explained that, based upon the identified coverage gap and candidate location search, plaintiffs selected 203 Kenmore Avenue as a candidate site.  (Dkt. No. 29-3)  The site was chosen due to the existence of a 75' telecommunications tower at that address.  (*Id.*)  However, the existing tower was

9

of insufficient height to remedy the coverage gap, and was structurally insufficient to support the necessary equipment, including Blue Wireless' antenna arrays. (Dkt. No. 29-16, ¶14; Dkt. No. 29-8) The Site Selection and Justification Report documented that Blue Wireless evaluated the search ring and immediately surrounding area and did not identify any other towers or tall structures on which collocation would be possible. (Dkt. No. 29-8) It was specifically explained that "no existing towers or structures are located within or near the search ring that provide a feasible solution to Blue Wireless' coverage objectives." (*Id.*) Further, Blue Wireless studied the use of alternative technologies to provide similar coverage and found that they were neither feasible nor practical. (Dkt. No. 29-8)

Thus, plaintiffs' 2017 Application ultimately proposed, as a feasible solution, removing the existing 75' telecommunications tower at 203 Kenmore Avenue and replacing it with a 100' telecommunication monopole, in order to provide the desired coverage. (Dkt. No. 29-16, ¶12; Dkt. No. 29-8) Blue Wireless would collocate its antennas on the replacement tower to provide reliable coverage to the surrounding areas, and the tower would also be designated to accommodate additional carriers. (Dkt. No. 29-8) The 2017 Application stated that aside from the height increase, the proposed replacement tower would largely maintain "current site conditions." (Dkt. No. 29-8) The 2017 Application further indicated that while the replacement tower would be slightly taller than the existing tower, it would have a slim monopole and antenna array design to mitigate any potential visual impacts. (Dkt. No. 29-8) Mature tree growth on the northern side of the property would be unaffected. (*Id.*)

*Town's Moratorium*

On March 27, 2017, the Town enacted a moratorium with respect to evaluating the Town Code for the approval of telecommunications facilities. (Dkt. No. 29-16, ¶15; Dkt. No. 29-10)  The purpose of the moratorium was for the Town to review and revise a local law regarding telecommunications tower installations. (Dkt. No. 29-10)  For the next four months, defendants ceased processing plaintiffs' 2016 and 2017 Applications. (Dkt. No. 29-16, ¶¶15-16; Dkt. No. 29-9)   In August of 2017, the Town determined that the moratorium did not apply to the 2016 and 2017 Applications, and resumed consideration of plaintiffs' pending proposals. (*Id.*) Specifically, defendants' counsel emailed plaintiffs' counsel on August 28, 2017 and indicated that the 2016 and 2017 Applications would be placed on the Planning Board agenda "this month with no further delay". (Dkt. No. 29-9) Defense counsel also represented that the "shot clock ran from the time the Town received the applications and began to process them." [5] (*Id.*) Plaintiffs submit that despite this determination, defendants still refused to place the 2016 and 2017 Applications on the Planning Board agenda. (Dkt. No. 29-16, ¶17)  Plaintiffs allege that on August 30, 2017, defendants' counsel informed plaintiffs' counsel, by telephone, that consideration of the Applications remained tolled pursuant to the moratorium, and that the Applications would not be placed on the next Planning Board agenda. (Dkt. No. 29-16, ¶17; Dkt. No. 29-1, ¶81)

On September 7, 2017, the Town sent a letter to plaintiffs indicating that the Planning Board would be reviewing the 2016 and 2017 Applications during their upcoming

---

[5] On November 18, 2009, the FCC issued a ruling requiring that a reviewing authority has 150 days from the date of application for a new tower to render a decision on the application. *See* FCC Declaratory Ruling, 24 FCC rcd. 13994, 14006 (¶ 45) (2009) ("Shot Clock Ruling")

meeting on October 4, 2017.  (Dkt. No. 29-16, ¶18; Dkt. No. 29-10)  The letter also indicated that additional information was needed in support of the applications.  (*Id.*)

### *Requests for Further Information and Denial of the 2016 and 2017 Applications*

On October 4, 2017, plaintiffs appeared before the Planning Board to further discuss the 2016 and 2017 Applications.  (Dkt. No. 1, ¶84; Dkt. No. 29-16, ¶18)  At the meeting, defendants requested revised propagation maps as well as engineering statements regarding the existing and proposed towers for both locations.  (Dkt. No. 29-16, ¶19; Dkt. No. 1, ¶¶85-86)  Plaintiffs submitted the requested information on November 22, 2017.  (*Id.*)

Plaintiffs' counsel again appeared before the Planning Board on December 6, 2017.  (Dkt. No. 1, ¶87)  The Planning Board did not act on the Applications at that time, but instead sought further information.  (*Id.*)  Specifically, the Planning Board sought supplemental propagation maps; alternative site and technology analysis for both Applications; and information concerning the proposed tower design and lay-out for the 2016 Application.  (Dkt. No. 29-16, ¶20; Dkt. No. 1, ¶88)  Plaintiffs submitted the requested materials on January 12, 2018.  (Dkt. No. 29-16, ¶20; Dkt. No. 1, ¶¶89-90)  The materials provided included a structural analysis report of the existing tower described in the 2016 Application; side by side propagation maps; and a fall zone letter.  (*Id.*)

Plaintiffs indicate that despite the fact that they provided all additional requested information, defendants failed to place the Applications on the agenda of the next Planning Board meeting.  (Dkt. No. 1, ¶91)  Plaintiffs further submit that their counsel met with Town officials on May 2, 2018 and May 7, 2018, to both seek clarification as to certain issues and to request that the Applications be placed on the Planning Board agenda for

the next meeting. (Dkt. No. 1, ¶¶92-93) Plaintiffs were again asked to provide information regarding, *inter alia*, the structural integrity of the existing towers at both sites as well as additional information as to the feasibility of either collocation or use of alternative technologies. (Dkt. No. 29-16, ¶21; Dkt. No. 1, ¶¶93-95) Plaintiffs were also asked to provide information as to why a single tower could not be used at the 860 Niagara Falls Boulevard location. (*Id.*) Plaintiffs complied with the Town's request and submitted supplemental materials and project plans on May 23, 2018. (Dkt. No. 29-16, ¶21; Dkt. No. 11)

In the supplemental materials submitted on May 23, 2018, plaintiffs again demonstrated that collocation at the existing, taller tower at 860 Niagara Falls Boulevard was not feasible. (Dkt. No. 29-16, ¶22; Dkt. No. 29-11) Specifically, plaintiffs cited a February 3, 2016 structural analysis report which considered the tower's ability, in its current state, to support the new loading that would be necessary if Blue Wireless were to collocate there. (*Id.*) It was determined that the existing tower was unable to structurally support the equipment and that structural replacement would be required. (*Id.*) The supplemental response also explained that Blue Wireless' RF engineers performed an analysis as to whether another existing tower, located at the intersection of Sheridan Drive and Eggert Road, could be used to fill the coverage gap. (*Id.*) After studying radiofrequency plots, the engineering team determined that the existing Sheridan Drive tower was unable to provide the necessary coverage or fill the gaps in Blue Wireless' network. (*Id.*) It was explained that the proposed tower replacement at 860 Niagara Falls Boulevard would cover more than double the area and population than the existing tower at Sheridan Drive. (*Id.*) Specifically, the proposed replacement tower

at Niagara Falls Boulevard would provide 14,629 people with reliable in-building coverage as opposed to the 5,897 people that would be covered by the existing tower on Sheridan Drive. (*Id.*) The total in-vehicle coverage for the proposed replacement tower would include 49,513 people whereas only 19,186 people would be provided in-vehicle coverage from the Sheridan Drive tower. (*Id.*)

Also in the May 23, 2018 supplemental materials, plaintiffs explained why the use of a single tower at 860 Niagara Falls Boulevard was not feasible. (Dkt. No. 29-11) Specifically, the towers are under separate ownership and there are ground space limitations at each tower site. (*Id.*) Plaintiffs also indicated that Blue Wireless' RF engineering team analyzed whether microcells, instead of a replacement tower, could be used to satisfy coverage needs. (*Id.*) The RF engineering team concluded that "it would not be possible to replicate coverage from this tower with microcells and would theoretically require a large number of microcells to attempt to do so which would be impractical and inefficient from a technological, siting, and business implemental perspective." (*Id.*)

On June 6, 2018, the Planning Board recommended denial of plaintiffs' 2016 and 2017 Applications. (Dkt. No. 29-16, ¶23; Dkt. No. 29-12) On July 30, 2018, the Town Board passed a resolution officially denying the 2016 and 2017 Applications. (Dkt. No. 29-16, ¶23) The denials occurred nearly two years after the 2016 Application was submitted, and one year and five months after the 2017 Application was submitted. (*Id.*) The Town Board's denials were based upon letters from the Planning Board dated June 19, 2018. (Dkt. No. 29-16, ¶24; Dkt. Nos. 29-13 and 29-14) In denying both the 2016 and 2017 Applications, the Planning Board explained that the proposed new towers at

860 Niagara Falls Boulevard and 203 Kenmore Avenue would be located extremely close to residential areas and that "while [plaintiffs] made a case that [the] site[s] would fill service gaps, [plaintiffs] did not demonstrate that other sites, with less impact on residential areas, were not viable." (Dkt. Nos. 29-13 and 29-14)  The Town Board's July 30, 2018 resolution, which referenced the Planning Board's June 19, 2018 letters, noted that the towers would have a negative impact on the surrounding area, the Town, and the community as a whole.  (Dkt. No. 1, ¶¶103-04)  The Town Board also stated that the addition of a second 155' tower at 860 Niagara Falls Boulevard would negatively impact the aesthetic character of the neighborhood.  (*Id.*)  Likewise, the Town Board stated that the erection of a 100' monopole at 203 Kenmore Avenue would negatively impact the aesthetic character of the neighborhood.  (*Id.*)  Plaintiffs submit that they were never informed that the 2016 and 2017 Applications were on the Town Board agenda for the July 30, 2018 meeting prior to the denial, and that the Town Board failed to hold a public hearing on either application.  (Dkt. No. 29, ¶¶25-26)

## DISCUSSION

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56.  A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material

fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991); *see also Matsushia Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (summary judgment is appropriate when "the record as a whole could not lead a rational trier of fact to find for the non-moving party"). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011); *see also Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2007) (an issue of fact is considered "material" if it "might affect the outcome of the suit under the governing law").

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). *See e.g., Gottlieb v. County of Orange*, 84 F.3d 511, 519 (2d Cir. 1996) (opposing party cannot defeat summary judgment motion by "relying on the allegations in his pleading…or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.")

### *Defendants' denial of the 2016 and 2017 Applications constitutes a prohibition of wireless services in violation of the Telecommunications Act.*

The Telecommunications Act of 1996 (the "TCA"), codified in part at 47 U.S.C. § 332, is "an omnibus overhaul of the federal regulation of communications companies."

*Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir 1999). The TCA was enacted to "provide for a procompetitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services...by opening all telecommunications markets to competition." *Id.* Pursuant to the TCA, municipalities retain authority over "decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. §332(c)(7)(A). However, municipalities are restricted from making zoning decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." *See* 47 U.S.C. § 332(c)(7)(B)(i)(II). This section is known as the "effective prohibition provision." *Orange County-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 293 (SDNY 2015). *See also N.Y. SMSA Ltd, Partnership v. Town of Clarktown*, 612 F.3d 97, 101 (2d Cir. 2010) (Section 332(c)(7) "preserve[s] the authority of state and local governments over zoning and land use, but impose[s] limitations on that authority."); *Willoth*, 176 F.3d at 637 (explaining that Section 332(c)(7) "limits the state and local government's authority to deny construction of wireless telecommunications towers...and regulates how such decisions must be made.")

The Second Circuit's leading case on the effective prohibition provision of the TCA interprets the provision to "preclude[] [municipalities from] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land lines." *Willoth*, 176 F.3d at 637, 643. Thus, under the *Willoth* standard, "a plaintiff will prevail on a[n] [effective prohibition claim pursuant to] Section 332(c)(7)(B)(i)(II)...if it shows that a 'significant gap' exists in wireless coverage and that its proposed facility is 'the least intrusive means' to close that

17

gap." *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456-57 (SDNY 2009); *citing Willoth*, 176 F.3d at 643. As explained in further detail below, defendants here violated the effective prohibition provision of the TCA by denying the 2016 and 2017 Applications despite the fact that plaintiffs sufficiently demonstrated that significant coverage gaps existed and that plaintiffs' proposed telecommunications towers at 860 Niagara Falls Boulevard and 203 Kenmore Avenue were the least intrusive means for closing those coverage gaps.

The uncontroverted facts in the record demonstrate that, during the application process, plaintiffs presented ample evidence to the Town that significant wireless coverage gaps existed, and that their proposed new telecommunications towers would remedy those gaps. Specifically, in the 2016 Application, plaintiffs presented data and documents showing how Blue Wireless' RF engineering team used propagation maps as well as coverage prediction software to identify a gap in coverage at the intersection of Sheridan Drive and Bailey Avenue and the surrounding areas. Likewise, in the 2017 Application, plaintiffs presented data and documents showing how Blue Wireless' RF engineering team used propagation maps as well as coverage prediction software to identify an in-building coverage gap in the vicinity of Kenmore Avenue and Niagara Falls Boulevard and the surrounding areas. Both Applications included maps depicting the coverage gaps. Moreover, both the 2016 and 2017 Applications explained how Blue Wireless' RF engineering team used search rings to identify the best locations for the placement of cell sites to remedy these gaps. Both Applications included maps of the new, proposed coverage areas once a cell site was installed at the identified location. The undisputed evidence further demonstrates that plaintiffs submitted, on multiple

occasions, supplemental RF propagation maps in response to the Town's request for further information as to the coverage gaps. Thus, the record here clearly demonstrates that (1) significant gaps in coverage exist in the Town of Tonawanda; and (2) the placement of new cell sites or facilities at 860 Niagara Falls Boulevard and 203 Kenmore Avenue would remedy those gaps in coverage. *See Town of Ramapo*, 701 F. Supp. 2d at 458 (relying on the plaintiff's RF analysis and corresponding maps of coverage submitted with its application, technical studies, and an affidavit and testimony from an RF engineer to conclude that plaintiff demonstrated a significant gap in coverage); *Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 218-19 (SDNY 2004) (relying on plaintiff's RF reports, expert testimony, propagation analysis, and field test data to conclude that plaintiff established a significant gap in coverage).

Defendants contend that they were permitted to deny the Applications because the Town has "not adopted plaintiffs' position" that there are gaps in coverage. The Court rejects this argument. Defendants have failed to offer any admissible, credible evidence to contradict the substantial proof in the record, submitted by plaintiffs, that gaps in wireless coverage exist at the two locations described in the 2016 and 2017 Applications. *See St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (A party responding to a well-supported motion for summary judgment must present specific evidence in support of their contention that there is a genuine dispute as to a material fact in the case.); *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) (Conclusory statements, mere conjecture, hearsay or speculation by the party resisting summary judgment cannot defeat the motion.); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1866) (the nonmoving party cannot defeat summary judgment by "simply showing that

19

there is some metaphysical doubt as to the material facts."). Considering the unchallenged evidence submitted here, no rational trier of fact could conclude that coverage gaps did not exist or that the proposed towers would not remedy the gaps.

Moreover, there is no evidence in the record that defendants denied the 2016 or 2017 Applications on the basis that plaintiffs either failed to establish that gaps in coverage existed, or failed to show that the proposed towers would adequately remedy those gaps. Instead, the Town Board denied the Applications on the basis that plaintiffs failed to demonstrate that other sites, with less impact on residential areas, were not viable. In fact, both denial letters by the Planning Board specifically acknowledged that plaintiffs "made a case that [the proposed] site[s] would fill service gaps". Thus, not only have defendants failed to create a genuine issue of material fact as to whether coverage gaps exist, but any argument by defendants that the 2016 or 2017 Applications were rejected on that basis appears to be an improper, *post hoc* rationalization for the denial. *See Metro PCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 423-24 (SDNY 2010) (rejecting the defendant town's concern about the safety of the proposed wireless facility because "it was not raised during the application process and appears to be a *post hoc* rationalization for denying the application"); *Nextel of N.Y., Inc v. City of Mount Vernon*, 361 F. Supp. 2d 336, 342 (SDNY 2005) (concerns about adverse aesthetic impacts not mentioned in the city's written decision cannot be raised first in litigation); *Omnipoint Communs., Inc. v. Town of Lagrange*, 658 F. Supp. 2d 539, 559 (SDNY 2009) (finding that a significant gap in wireless coverage was undisputed since "[a]t no time

during the underlying proceedings did the [defendant town] contest the depicted gap in coverage").[6]

As to the second prong of an effective prohibition claim, the record here, considered in a light most favorable to defendants, proves that the replacement towers proposed in the 2016 and 2017 Applications are the least intrusive means of closing the identified coverage gaps. The 860 Niagara Falls Boulevard location was selected as a proposed site because two telecommunications towers already exist on the premises. Likewise, the 203 Kenmore Avenue location was selected because one telecommunications tower already exists on the premises. In fact, plaintiffs' RF engineering team studied the existing towers at both locations to ascertain if collocation of Blue Wireless' equipment was possible. The engineers determined that collocation was not feasible at either location because of the height, structural integrity, and capacity of the existing towers. Plaintiffs also used a search ring to evaluate the surrounding areas and could find no other existing tower or tall structure to accommodate their equipment, specifically their antenna arrays. In addition, alternative technologies were considered

---

[6] In response to plaintiffs' summary judgment motion, defendants represented that they have hired an expert to provide an opinion as to whether the gaps in coverage identified by plaintiffs are accurate, as well as whether the proposed replacement facilities would succeed in remedying the gaps. Defendants are still waiting for the results of this expert analysis. As stated herein, there is no evidence in the record that the 2016 and 2017 Applications were denied on the basis that plaintiffs failed to show a gap in coverage. In fact, defendants admit that they hired an expert to assess the coverage gap only after issuing their written denial of the Applications and after plaintiffs commenced the instant litigation. Thus, an untimely expert opinion as to the validity of the coverage gaps is not a valid basis to either deny plaintiffs' summary judgment motion or to remand the matter for further administrative proceedings. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (courts may not accept *post hoc* rationalizations for agency action). Further, the Court notes that the 2016 Application was pending for almost two years before the Town issued a denial, and the 2017 Applications was pending for approximately one year and five months before the Town issued a denial. Thus, defendants had ample time, during the review process, to raise questions or issues as to whether a true coverage gap existed, and also to retain an expert to provide an opinion in that regard. However, they failed to do so. Plaintiffs should not now be punished for defendants' inaction and delay.

and found to be neither feasible nor practicable.  Thus, it was only after determining that collocation and other technologies were not possible at either of the proposed sites or in any of the surrounding areas that plaintiffs applied to replace the shorter existing telecommunications tower at 860 Niagara Falls Boulevard and the existing telecommunications tower at 203 Kenmore Avenue.

It is also undisputed that, during the application review process, plaintiffs provided ample supplemental information, upon request of defendants, which directly addressed the feasibility of less intrusive facilities or technologies.  Specifically, plaintiffs provided an inventory of existing facilities operated by plaintiffs within the Town of Tonawanda and explained that those existing towers or tall structures were either unavailable or not suitable for collocation.  Plaintiffs provided structural reports of the existing towers at both 860 Niagara Falls Boulevard and 203 Kenmore Avenue to demonstrate that collocation was not possible.  Plaintiffs provided an explanation as to why use of a single tower at 860 Niagara Falls Boulevard was not feasible.  Blue Wireless' RF engineers also studied an existing tower at the intersection of Sheridan Drive and Eggert Road, and determined that the tower could not provide the extensive coverage needed to fill the gap.  Lastly, Blue Wireless' RF engineering team analyzed whether microcells could be used instead of replacement towers, and it was determined that this technology was not a viable alternative because of the vast number of microcells that would be necessary to remedy the coverage gap.  In short, plaintiffs not only undertook efforts to identify the least intrusive means to remedy the coverage gaps before submitting the 2016 and 2017 Application, but they also considered the alternative sites or solutions identified by the

Town, and provided sufficient explanation and evidence as to why those alternatives were not feasible.

By submitting clear proof that collocation or use of alternative technologies was not feasible, plaintiffs have demonstrated that replacement of existing telecommunications towers at 860 Niagara Falls Boulevard and 203 Kenmore Avenue, as proposed in the 2016 and 2017 Applications, was the least intrusive means of remedying the coverage gaps. In response, defendants have put forth no credible, admissible evidence to suggest that other, less-intrusive means of remedying the coverage gaps existed and were available to plaintiffs. *See Town of Lagrange*, 658 F. Supp. 2d at 560 (concluding the plaintiffs established the second prong of the effective-prohibition test because "the [defendants] denial of [the plaintiff's] application has left [the plaintiff] with no feasible means of filing the gap" and "[t]his situation clearly has the effect of prohibiting wireless services within the Town, in violation of the TCA."); *New Cingular Wireless Pcs v. Town of Fenton*, 843 F. Supp. 2d 236, 254 (NDNY 2012) (finding that plaintiff met its burden to establish that its proposed facility was the least intrusive means to remedy its gap in coverage because the plaintiff "analyzed, in great detail, every attempt by the [board] and town residents to identify a less intrusive, but still feasible, alternative", but no alternative locations existed).

The undisputed facts before the Court, considered in a light most favorable to defendants, establishes that the two proposed telecommunications towers described in the 2016 and 2017 Applications are the least intrusive means to remedy the significant

gaps in wireless coverage in the Town of Tonawanda.[7]  Therefore, the Court finds that plaintiffs are entitled to summary judgment as to their claim based on the effective prohibition provision of the TCA.

> ### *Defendants' delay in processing the 2016 and 2017 Applications violated the shot clock provision.*

The TCA provides that state and local governments must act on permit applications "within a reasonable period of time after the request is duly filed." *See* 47 U.S.C. §332(c)(7)(B)(ii).  Specifically, the FCC has established that a "reasonable period of time" for a municipality to review a wireless facility application is 150 days (the "shot clock").  *See In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, 24 F.C.C.R. 13994, ¶ 32 (2009) ("FCC 2009 Order").  The shot clock is designed to prevent "local authorities from keeping wireless providers tied up in the hearing process through invocation of state procedures, moratoria or gimmick." *Lucas v. Planning Bd. of the Town of LaGrange*, 7 F. Supp. 310, 321-22 (SDNY 1998) (internal quotations and citations omitted); FCC 2009 Order (noting that "personal wireless service providers have often faced lengthy and unreasonable delays in the consideration of their facility siting applications, and that the persistence of such delays is impeding the deployment of advanced emergency services.").  The FCC 2009 Order further declares

---

[7] Plaintiffs note that the FCC recently issued a declaratory ruling interpreting the effective prohibition language of Section 332(c)(7)(B)(i)(II) of the TCA.  *See In the Matter of Acceleration of Broadband Deployment by Removing Barrier to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, FCC 18-1333 (Sept. 27, 2018) (the "FCC 2018 Order").  The FCC 2018 Order states that the "significant gap/least intrusive means" test utilized by the Second Circuit to analyze claims under the effective prohibition provision of the TCA places too much importance on preserving local authority. While not explicitly rejecting the Second Circuit's standard, the FCC declared that "an effective prohibition [of service] occurs where a state or local authority materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service." FCC 2018 Order ¶ 40, n. 97.  Here, the Court finds that whether defendants' actions are analyzed using the "significant gap/least intrusive means" standard, as adopted by the Second Circuit and applied herein, or using the more lenient or plaintiff-friendly standard set forth in the FCC 2018 Order, it still must be concluded that defendants violated the effective prohibition provision of the TCA.

that, when a state or local government does not act within the applicable timeframe, and the timeframe is not extended by mutual consent, then a "failure to act" has occurred pursuant to Section 332(c)(7)(B)(v) of the TCA, and the wireless provider may seek judicial redress. FCC 2009 Order at ¶¶¶ 32, 37, 51; 47 U.S.C. § 332(c)(7)(B)(v). The 2009 FCC Order also makes clear that the shot clock is not tolled regardless of any moratoriums imposed by a municipality. *See* FCC 2009 Order at ¶ 136. *See also Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, 29 F.C.C.R. 12865 (2014) (the "2014 FCC Order") at ¶ 265 (noting that the FCC has issued additional guidance to clarify that the 150-day time frame, or shot clock, "runs regardless of any moratorium.").

Plaintiffs submitted the 2016 Application on August 3, 2016 and the 2017 Application on February 16, 2017. On March 27, 2017, after the Applications were submitted, the Town enacted a moratorium for purposes of evaluating the Town Code with respect to telecommunications facilities. In contravention of the FCC 2009 Order, and even though both Applications were submitted prior to the enactment of the moratorium, the Town refused to consider the Applications for at least four months during the moratorium. Instead, the Town took the incorrect position that the shot clock was tolled by the moratorium. *See Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309 (NDNY 2017) ("While local moratoria on applications may be necessary and advisable to permit a municipality to update applicable zoning regulations, the moratorium does not stop the shot clock period, regardless of whether an application is received before or after the moratorium was enacted."). When the Applications were finally placed on the Planning Board's agenda for October 4, 2017, defendants requested several

25

rounds of additional information and continued to significantly delay in adjudicating the Applications.  Ultimately, the Town Board did not render a decision on the Applications until July 30, 2018, nearly two years after the 2016 Application was submitted and a year and five months after the 2017 Application was submitted.  Since both denials were made well after the 150-day time limitation, and the moratorium did not toll defendants' obligations to process the Applications, defendants violated their duty, under the TCA, to act upon the Applications within a reasonable period.  *See* 47 U.S.C. §332(c)(7)(B)(ii).[8]

> *Defendants' denial of the 2016 and 2017 Applications was not supported by substantial evidence.*

The TCA requires that denials of applications to place, construct or modify personal wireless service facilities be in writing and supported by substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(iii).  Substantial evidence has been interpreted to mean "less than a preponderance, but more than a scintilla of evidence." *Cellular Tel. Co v. Town of Oyster Bay*, 166 F.3d 490 (2d Cir. 1999); *see also Universal Camera v. MLRB*, 340 U.S. 474, 477 (1951) ("It means such relevant evidence as a reasonable mind must accept as adequate to support a conclusion.").  However, the record should be viewed in its entirety, including evidence opposed to the municipality's view. *American Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981).

---

[8] The FCC has declared that a "local authority's exceeding a reasonable time for action would not, in and of itself, entitle the [] applicant to an injunction granting the application." *See* FCC 2009 Order.  Rather, "the only reasonable [equitable] relief for such a failure [would be] to require a written decision" as to the applications. *Clear Wireless, LLC v. City of Wilmington*, 10-CV-218, 2010 U.S. Dist. LEXIS 89237 (D. Del. Aug. 30, 2010).  Here, defendants have already issued a written denial of the 2016 and 2017 Applications. Thus, this remedy would be moot. *See Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, 12-CV-6157, 2013 U.S. Dist. LEXIS 93699 (SDNY July 3, 2013) (holding that because municipality issued a written denial of wireless service provider's application, claim for injunctive relief for violation of Section 332(c)(7)(B)(ii) was moot).  However, the Court finds, that for other reasons stated *infra*, plaintiffs here are entitled to injunctive relief based upon other violations of the TCA by defendants.

"[W]hile the TCA governs the 'procedural requirements that local boards must comply with in evaluating cell site applications', the applicable substantive standards are the 'established principles of state and local law.'" *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 355 (EDNY 2012); *quoting Oyster Bay*, 166 at 494 (2d Cir. 1999). Therefore, when a court determines whether a municipality's reason for a denial was supported by substantial evidence under the TCA, "local and state zoning laws govern the weight to be given the evidence." *Oyster Bay*, 166 F.3d at 494. Pursuant to New York law, wireless providers are public utilities for the purposes of zoning applications. *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364 (1993). As a result, applications by wireless providers are reviewed under the public necessity standard or test. *Oyster Bay*, 166 F.3d at 494; *quoting Consol. Edison Co v. Hoffman*, 43 N.Y.2d 598 (1978). Pursuant to the public necessity standard, a carrier, such as Blue Wireless, must establish: (1) "that there are gaps in service"; (2) "that the location of the proposed facility will remedy those gaps"; and (3) "that the facility presents a minimal intrusion on the community". *Site Acquisitions, Inc. v. Town of New Scotland*, 2 A.D.3d 1135, 1137 (3d Dept. 2003). *See also Rosenberg*, 82 N.Y.2d at 373-74 (holding that the zoning board abused its discretion in denying a variance because the telecommunications company established that "the proposed installation would have a negligible impact on the surrounding neighborhood" and that it would "enable [the company] to remedy gaps in its service area that currently prevent it from providing adequate service to its customers.").

Importantly, in order to establish public necessity, "the carrier must demonstrate not that the proposed facility was the 'least intrusive means', but rather that the proposed facility was '*more feasible* than other options.'" *N.Y. SMSA Ltd. P'ship v. Vill. of Floral*

*Park Bd. of Trs.*, 812 F. Supp. 2d 143 (EDNY 2011); *quoting Omnipoint Communs., Inc. v. City of White Plains*, 403 F.3d 529, 535 (2d Cir. 2005) (emphasis added). District courts in this Circuit have generally concluded that "[i]f the [wireless carrier] makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the [application] must [be granted]." *Vill. of Floral Park*, 812 F. Supp. 2d at 154; *citing Town of Lagrange*, 658 F. Supp. 2d at 555 ("Whether the utility ha[s] made the requisite showing and whether the municipality's negative decision is supportable by substantial evidence appear to be two sides of the same coin.").

Considering the undisputed facts here in the light most favorable to defendants, the Court finds, for all the reasons stated previously, that there were gaps in service in the Town of Tonawanda and that the replacement of the shorter existing tower at 860 Niagara Falls Boulevard as well as the replacement of the single existing tower at 203 Kenmore Avenue would remedy the gaps in service. Thus, the Court concludes that plaintiffs have met the first two prongs of the public necessity standard.

Turning to the third prong of the public necessity standard, the uncontroverted evidence in the record establishes that the two proposed telecommunications towers will present minimal intrusion to the community. It is undisputed that the 2016 Application seeks to replace one of two already existing telecommunications towers at 860 Niagara Falls Boulevard. Likewise, it is undisputed that the 2017 Application seeks to replace an already existing tower at 203 Kenmore Avenue. By replacing telecommunications towers on commercially zoned parcels where towers or tall commercial structures already exist, as opposed to building new facilities or towers near residential areas where no towers or tall structures currently exist, plaintiffs will remedy the coverage gap with minimal intrusion

on the community.  Plaintiffs concede that the replacement towers at each location will be taller than the existing facilities.  However, the towers will largely maintain all other current site conditions, including color and landscaping.  In fact, the 2017 Application specifically indicated that the replacement tower would have a slim monopole and antenna array designed to mitigate any potential visual impacts.  *See MetroPCS N.Y., LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 451-52 (EDNY 2011) (finding that the carrier demonstrated minimal intrusion on the community where application required adding small structures to an existing building).

Defendants' denials of the 2016 and 2017 Applications appear to be based, in large part, on aesthetic concerns.  Specifically, the June 19, 2018 Planning Board denial letters indicated that the proposed towers "would be located extremely close to residential properties."  Likewise, the Town Board noted that the erection of a second 155' tower at 860 Niagara Falls Boulevard as well as a 100' tower at 203 Kenmore Avenue would negatively impact the aesthetic character of both neighborhoods.  The Court finds that no rational trier of fact could conclude that the Town's reasoning here is supported by substantial evidence.  Under the TCA, a court "can find that aesthetics qualify as a permissible ground for denial of a permit only if [a court] can conclude that there was 'more than a mere scintilla' of evidence…before the Board on the negative visual impact of the site."  *Oyster Bay*, 166 F.3d at 495.  It is undisputed that two telecommunications towers already exist at 860 Niagara Falls Boulevard.  The Court rejects defendants' contention that replacing the shorter of the two towers with a taller structure, while maintaining all other site conditions, would have more than a minimal impact on the aesthetics of the surrounding area.  Likewise, defendants have failed to show how

replacing a 75' tower with 100' tower at 203 Kenmore Avenue would have more than a minimal impact on the aesthetics of the area.  In fact, the new tower is specifically designed with a slim monopole and antenna array to mitigate any visual impacts.  District courts in this Circuit have concluded that speculative concerns about the potential visibility of a proposed tower are unlikely to constitute substantial evidence for the denial of a permit, absent some sort of objective support in the form of "photographs, site plans, surveys and the like."  *Town of Islip,* 893 F. Supp. 2d 338.  Here, defendants have put forth no admissible evidence to specifically demonstrate the aesthetic impact of either proposed tower.  Thus, defendants' conclusory and unsupported statements of a negative aesthetic effect, considered in light of all the undisputed evidence before the Court, are insufficient to rise to the level of substantial evidence to support a permit denial.  *See Town of Fenton,* 843 F. Supp. 2d at 252-53 ("Although aesthetic impacts may be a reasonable basis for denying an application for a wireless communications facility, such a denial must be based on more than just unsupported opinion."); *T-Mobile Ne., LLC v. Inc. Vill. of E. Hills,* 779 F. Supp. 2d 256, 268 (EDNY 2001) (holding that a zoning board must articulate more than "generalized" aesthetic concerns).

Defendants also denied both the 2016 and 2017 Applications on the basis that plaintiffs failed to demonstrate that other sites, with less impact on residential areas, were not viable.  To that end, defendants argue that there are alternative commercial sites or existing towers that would address plaintiffs' needs.  Here again, the Court finds that no rational trier of fact could conclude that this reason for denial is supported by substantial evidence.  As explained in detail above, before submitting the 2016 and 2017 Applications, plaintiffs investigated collocating on the existing towers at 860 Niagara Falls

Boulevard and 203 Kenmore Avenue. Plaintiffs proved that none of those towers had the height or structural capacity needed for collocation. Further, plaintiffs conducted a search ring and located other telecommunications towers in the nearby area. However, none of those towers were suitable for collocation. During the review process, plaintiffs submitted additional documentation and evidence demonstrating how collocation at several different sites was not feasible. Plaintiffs also provided information, from Blue Wireless' engineering team, as to why alternative technologies could not be used to address the coverage gap. In contrast, defendants have provided no admissible evidence to support their speculation that alternative, less-intrusive locations or technologies existed and could remedy the service gap.

Notably, a plaintiff carrier need not evaluate every potential alternative in order to demonstrate that its proposal meets the least restrictive means test. *Vill of Floral Park Bd. Of Trs.*, 812 F. Supp. 2d at 166. In fact, the law only requires a plaintiff to engage in "a good faith effort to evaluate alternative sites." *Id.* at 165. The uncontroverted facts in the record demonstrate that plaintiffs have met their burden here, and that defendants' claims to the contrary are not supported by substantial evidence. *See New York SMSA P'ship v. Inc. Vill. Of Mineola*, 01-CV-8211, 2003 U.S. Dist. LEXIS 28592 (EDNY Mar. 26, 2003) (summary judgment granted in favor of Verizon as to its claim that it was unlawfully denied a special use permit, where "Verizon met its burden of investigating alternatives and presented credible evidence regarding infeasibility of the sites and the Board presented no evidence to the contrary."); *New York SMSA Ltd. P'ship v. Town of Oyster Bay Zoning Board of Appeals*, 08-CV-4833, 2010 U.S. Dist. LEXIS 105563 (EDNY Sept. 30, 2012) (holding the substantial evidence provision was violated because "[t]he Board

presented no evidence that other sites were appropriate substitutions for the Property," and the carrier met its burden of investigating alternatives by presenting "good-faith justification for why all other sites, including ones suggested by the Board and others it sought out on its own, would not substitute for the property.").[9] Thus, the Court finds that plaintiffs are also entitled to summary judgment because the denials were not supported by substantial evidence.

### *Defendants' request for remand is denied.*

Defendants contend that should the Court determine that a violation of Section 332 of the TCA has occurred, the proper remedy is to remand the 2016 and 2017 Applications back to defendants for further review. The TCA does not provide a specific remedy for violation of the various provisions contained in 47 U.S.C. § 332(c)(7). *Town of Ramapo*, 701 F. Supp.2d at 463 (SDNY 2009). However, with respect to a violation of the substantial evidence provision of the TCA, "almost all courts to address the question have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *Id.; quoting Oyster Bay*, 166 F.3d at 492 (collecting cases). Further, the Second Circuit has found that a violation of the effective prohibition provision of the TCA requires injunctive relief. *Id.; Willoth*, 176 F.3d at 643.

---

[9] Because the Court finds that defendants' denial of the 2016 and 2017 Applications was not supported by substantial evidence, the Court also finds that the defendants' denial was arbitrary and capricious under Article 78 of the New York Civil Practice Laws and Rules. *See Town of Fenton*, 843 F. Supp. 2d at 253 (noting that the substantial evidence test under the TCA and the "arbitrary and capricious" standard under Article 78 are essentially the same); *Town of Ramapo*, 701 F. Supp. 2d at 461 (Article 78 imposes its own requirement that local decisions be supported by substantial evidence and the test for relief from a zoning board's decision under Article 78 "is essentially the same as that under the TCA.") (internal citations omitted).

As explained in detail herein, defendants did not adduce "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion" in denying the 2016 and 2017 Applications. *See Town of Oyster Bay*, 166 F.3d at 494. Moreover, given the completeness of the record and the information submitted by plaintiffs, the Court finds that defendants could not find substantial evidence in the record on which to deny the applications again, should the matter be remanded. Moreover, defendants have already demonstrated significant and unnecessary delay in rendering a determination as to the Applications. Therefore, the Court finds that any further proceedings before defendants would be futile. *See LaGrange*, 658 F. Supp.2d at 562 (declining town's request to remand matter to planning board; remand would "be both futile and inappropriate" due to the "considerable evidence of past delay on the [t]own's part and the only 'useful purpose' that would be served by remand" would be "allowing local officials to delay the inevitable for as long as possible"); *Oyster Bay*, 166 F.3d at 497 ("injunctive relief serves the TCA's stated goal of expediting resolution of this type of action," particularly where "remand would serve no useful purpose.").

For these reasons, the Court recommends that plaintiffs' request for an injunction be granted.

## CONCLUSION

For the foregoing reasons, the Court recommends that plaintiffs' motion for summary judgment and injunctive relief (Dkt. No. 29) be granted, and that the District Court order defendants to grant plaintiffs all permits and site approvals requested in plaintiffs' 2016 and 2017 Applications.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.* See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. See *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).*

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:      November 17, 2020
            Buffalo, New York


_____
HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge